FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

98 MAR 27 PM 3: 26

U.S. DISTRICT COURT
N.D. OF ALABAMA

ANNIE GEORGE,                          }
                                       }
        Plaintiff,                     }
                                       }
v.                                     }        CASE NO. CV 96-B-0526-S
                                       }
JEFFERSON COUNTY                       }
DEPARTMENT OF HUMAN                    }
RESOURCES; MARY LOU                    }
KEVORKIAN, individually and in her     }
official capacity as Director of the   }
Jefferson County Department of         }        ENTERED
Human Resources,                       }
                                       }        MAR 27 1998
        Defendants.                    }

## MEMORANDUM OPINION

Currently before the court is the motion of defendants Jefferson County Department of Human Resources and Mary Lou Kevorkian for summary judgment. Upon consideration of the record, the submissions of the parties, the argument of counsel, and the relevant law, the court is of the opinion that defendants' motion is due to be granted.

This suit arises out of the termination of plaintiff's employment with the Jefferson County Department of Human Resources ("DHR"). Plaintiff, Annie George, alleges that defendant DHR engaged in unlawful racial discrimination and retaliation against her in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Plaintiff also alleges that defendants DHR and Mary Lou Kevorkian violated her Equal Protection and Due Process rights under the Fourteenth Amendment to the United States Constitution. Plaintiff seeks equitable relief and compensatory and punitive damages. Defendants deny any unlawful employment practices.

57

## FACTUAL SUMMARY

Plaintiff is an African-American female with both a Bachelor of Science and Master's Degree in social work. (Pl.'s Evidentiary Submission in Opp'n to Defs.' Mot., Ex. 1 at ¶¶ 3-5.)[1]  On September 14, 1993, plaintiff submitted an application for a social worker position with the State Personnel Department's Employment Office ("SPD") in Birmingham. (Pl.'s Ex. 1 at ¶ 10; Pl.'s Ex. 1, subsections A, B.)  The 1993 application reflects that plaintiff had a Master's Degree in social work and that she intended to apply for a position as "social worker II or III." (Pl.'s Ex. 1, subsection A at 1.)

Harriet Mahlke is the Assistant Director of the Jefferson County DHR. (Evidentiary R. in Supp. of Defs.' Mot., Ex. 3 at 153, ¶ 2.)[2]  From January to June of 1994, her duties as Assistant Director included the hiring of staff for DHR's Birmingham office. (*Id.*)  In February of 1994, Ms. Mahlke obtained the SPD's Certification of Eligibles list,[3] which listed

---

[1]  Plaintiff's Evidentiary Submission in Opposition to Defendants' Motion for Summary Judgment consists of two volumes.  Volume One contains Exhibit 1 and 18 subsections tabbed as letters A-S.  Volume Two contains Exhibits 2-23.  Hereafter, references to these volumes of Plaintiff's Evidentiary Submission will be made by the notation "Pl.'s Ex.," followed by the Exhibit number, the letter of the subsection where applicable, and the paragraph or page number where applicable.

[2]  Defendants' Evidentiary Record in Support of Defendants' Motion for Summary Judgment contains Exhibits numbered 1-8.  Defendants' Rebuttal Evidence consists of Exhibits 9-21.  Each page of the record is stamped with consecutive page numbers from 1 through 445. Hereafter, references to this evidentiary record will be made by the notation "Defs.' Ex.," followed by the Exhibit number, the stamped page number, and the paragraph number, where applicable.

[3]  In her affidavit, Ms. Mahlke explains that the SPD's Certification of Eligibles list is commonly referred to as a "register" by state merit system employees. (Defs.' Ex. 3 at 153.)  The Rules of the SPD, however, differentiate between an eligible register and a Certificate of Eligibles. An "eligible register" is a list of names of persons who have successfully competed by examination arranged in order of their final rating. (*Id.* at 167.)  A "Certification of Eligibles" is a certification

plaintiff as a candidate for a social worker position. (Defs.' Ex. 3 at 157.)  The February

Certification of Eligibles list is ambiguous as to whether it pertains to the position of Social

Worker I, Social Worker II, or both. (Defs.' Ex. 3 at 155-57.)  Ms. Mahlke states in her

affidavit that she obtained this list in order to "fill vacancies in the merit system classification

of Service Social Worker I." (*Id*. at 153, ¶ 3). After interviewing plaintiff, Ms. Mahlke hired

her to fill the position of Social Service Worker I ("SSWI"), effective March 21, 1994. (*Id*. at

¶¶ 3-5.)  On that date, plaintiff began her six month probationary period as a SSWI with

DHR.

In April of 1994, plaintiff discovered that Sue Davis, a white female with a Master's

Degree in social work, had been hired for the position of Senior Service Social Worker

("SSSW"). (Pl.'s Ex. 1 at 3, ¶ 18.) Although they had both achieved the same level of

education, Ms. Davis received a higher salary than plaintiff because of her higher

classification. Plaintiff claims that she met with Ms. Mahlke and complained about Ms.

Davis's higher classification and salary. (*Id*. at ¶ 19.) Plaintiff attests that during this

meeting, she specifically asked Ms. Mahlke if the reason for the discrepancy in classification

and pay was because Ms. Davis was white and plaintiff was black. (*Id*.) She then states that

Ms. Mahlke became visibly upset and advised plaintiff that she would have to fill out a

separate application in order to be considered for the position of SSSW rather than SSWI. (*Id*.

---

of "the highest ten eligibles on the most appropriate employment register plus the names of all
those whose grades are tied with the tenth highest eligible, and if more than one vacancy is to be
filled the name of one additional eligible for each additional vacancy." (Id. at 174.)

3

at ¶ 20.)  Ms. Mahlke does not recall that such a meeting ever took place.  (Defs.' Ex. 3 at 154, ¶ 8.)

Plaintiff immediately applied for a position as a SSSW, designated by plaintiff as "Social Worker III" on her second application.  Plaintiff's name then appeared on the SPD's Certification of Eligibles for the SSSW position compiled on May 18, 1994.  (Defs.' Ex. 3 at 160.)  Ms. Mahlke used this list in selecting applicants for the SSSW position, and interviewed plaintiff for the position on June 8, 1994.  (Defs.' Ex. 3 at 154, ¶ 6.)  Plaintiff was appointed to the position of SSSW effective June 25, 1994.  (*Id.*)

Plaintiff was serving her probationary period as a SSWI prior to being hired as a SSSW in June of 1994.  She maintains that during her SSWI probationary period she was assigned a heavy case load of approximately 30 foster care cases, which included approximately 55 children.  (Pl.'s Ex. 1 at 3, ¶ 23-24.)  Plaintiff attests that foster care cases are much more time consuming and difficult than other types of cases.  (*Id.*)  She says that her job duties and responsibilities did not change and her caseload did not increase after this initial probationary period.  (Id. at ¶ 27, 32.)  Defendant DHR's worker caseload information sheets reflect that plaintiff's caseload increased gradually from five cases and two foster children in May of 1994, to a total of fifty cases and forty-three foster children in September of 1994.  (Defs.' Exs. 9-13.)  These same records show that plaintiff's caseload began to decrease after September 1994, to a total of twenty-one cases and sixteen foster children in November of 1994.  (Defs.' Exs. 14-15.)  Thus, there is conflicting evidence as to how many cases and children were assigned to plaintiff over the course of her employment.

On June 10, 1994, just prior to becoming a SSSW, plaintiff received an Employee Probationary Performance appraisal from her supervisor, Ms. Fennel, in which she received a "meets standards" rating. (Pl.'s Ex. 1, subsection D at 1.) After being reclassified as a SSSW on June 25, 1994, plaintiff began a new six month probationary period in compliance with the SPD's Rule 670-x-10-.01. (Defs.' Ex. 4 at 164.) Upon being reclassified, plaintiff maintains that her job duties and responsibilities did not change, and her caseload did not increase. (Pl.'s Ex. 1 at 4, ¶ 27.) On August 31, 1994, plaintiff received a second Employee Probationary Performance appraisal from Ms. Fennel, in which she received a "meets standards" rating. (Pl.'s' Ex. 1, subsection F at 1.) Although the bulk of her comments about plaintiff were positive, Ms. Fennel added that plaintiff "at times seem[ed] overwhelmed," and "needs to be aware of her frustration level when dealing with teenagers." (*Id.* at 2.)

During the second half of September 1994, plaintiff was transferred from Ms. Fennel's supervisory unit to Ms. Summerlin's supervisory unit. (Pl.'s Ex. 1 at 4, ¶ 29.) Ms. Summerlin was new to her supervisory position at the time of the transfer. (Pl.'s Ex. 10 at 12-13.) After the transfer, plaintiff started having problems coping with her job and cooperating with her supervisors. During September and October of 1994, several incidents caused conflict between plaintiff and Ms. Summerlin. A central point of contention was DHR's receipt of several Court Incident Reports, all reporting acts of noncompliance on the part of the plaintiff. (Defs.' Ex.1 at 114-18.) Besides these reports, Ms. Summerlin's complaints about plaintiff's performance during this period include allegations that plaintiff failed to inform Ms. Summerlin of children in the office needing placement, failed to adhere to court orders concerning the placement of children, did not return phone calls, and did not

5

prioritize assignments correctly. (Pl.'s Ex. 1, subsection G.) Plaintiff, on the other hand, contends that Ms. Summerlin did not perform her supervisory duties adequately, failed to communicate regularly with plaintiff about the status of her cases, and made sarcastic comments to plaintiff about her education. (Pl.'s Ex. 1 at 4, ¶¶ 30-31; Pl.'s Ex. 2 at 237-240.)

The Court Incident Reports and alleged acts of insubordination led to a November 1, 1994, conference between plaintiff, Ms. Summerlin, and their program supervisor, Loree Williams. (Pl.'s Ex. 1, subsection I at 1). The evidence shows that, during the conference, Ms. Summerlin and Ms. Williams discussed with plaintiff several deficiencies in plaintiff's job performance. (Pl.'s Ex. 1, subsection I.) After the conference, plaintiff set forth in writing her grievances against the defendants, including her complaint that she was not given sufficient notice of the November 1, 1994 conference and, consequently, could not adequately prepare and defend herself. (Pl.'s Ex. 1, subsections H,I.) Ms. Summerlin proceeded to set forth her complaints about the plaintiff in a written memo, with which plaintiff was presented but refused to sign. (Pl.'s Ex. 1, subsection G.) Plaintiff states that she was not presented with Ms. Summerlin's written summary of complaints until after the November 1, 1994 conference was held. (Defs.' Ex. 1 at 84.)

In the latter part of November, 1994, DHR's program manager, Regina Slaughter, went to the director of DHR, Mary Lou Kevorkian, and requested that plaintiff's employment with DHR be terminated. (Defs.' Ex. 1 at 1, ¶¶ 2-3.) Ms. Slaughter expressed to Ms. Kevorkian that plaintiff had shown poor professional judgment and that all of plaintiff's immediate supervisors were in agreement that plaintiff should be terminated. (*Id.*) Ms.

6

Kevorkian states that an administrative hearing concerning plaintiff's termination was not required under the SPD's rules because plaintiff was a probationary, rather than a permanent, employee. (Defs.' Ex. 1 at 1, ¶ 4.) She therefore scheduled an informal conference to discuss the matter with plaintiff and her supervisors on December 12, 1994. (*Id.*)

All of plaintiff's supervisors as well as Ms. Kevorkian were present at the December 12, 1994 conference. (Defs.' Ex. 1 at 4.) During the conference, Ms. Kevorkian mediated as Ms. Fennel, Ms. Summerlin, and Ms. Williams aired their complaints about plaintiff's work habits. (Defs.' Ex. 1 at 4-23.) Ms. Fennel had numerous complaints about plaintiff's performance, including her poor attitude and her failure to attend training sessions and conferences, process records, and use time wisely. (*Id.* at 4-15.) Ms. Summerlin complained that plaintiff had a poor and sarcastic attitude and failed to follow instructions and court orders. (*Id.* at 15-23.) Plaintiff was then given the opportunity to explain her version of the events. (*Id.* at 23-78.) At the end of the conference, Ms. Kevorkian asked the supervisors whether they felt that more time on the job would correct the problems they had perceived in plaintiff's performance. (*Id.* at 66-7.) The transcript of the conference reflects no response from Ms. Fennel and Ms. Summerlin.[4] (*Id.* at 67.) Ms. Williams, however, replied that more time would not correct the problem, and Ms. Slaughter concurred. (*Id.* at 67-9.) The conference resulted in the termination of plaintiff's probationary employment, effective

---

[4] In her deposition, Ms. Fennel clearly states that she agreed with the decision to terminate Ms. George and that she would not want to have Ms. George employed in her unit. (Defs.' Ex. 7 at 279-84).

7

December 12, 1994. (Defs.' Ex. 1 at 1, ¶ 2.) After being terminated, plaintiff filed an EEOC charge against the defendants dated December 19, 1994. (*Id.* at 2, ¶ 9.)

## SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present

8

evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a properly made motion has been properly responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v.*

9

*Zimmerman*. 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## DISCUSSION

### I. Plaintiff's Title VII Claims

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . ." 42 U.S.C. § 2000e-2(a)(1). Title VII defines the term "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees . . ." 42 U.S.C. § 2000e(b). Because defendant Mary Lou Kevorkian would not qualify as an "employer" under Title VII, plaintiff's Title VII discrimination claims can only be brought against defendant DHR.

Plaintiff claims that she was subjected to discrimination in hiring, discrimination in subjecting her to a probationary period, discriminatory termination and retaliation for opposing DHR's unlawful employment practices. (Am. Compl. at ¶¶ 6-13.) The court is of the

10

opinion that DHR's motion for summary judgment as to all of plaintiff's Title VII claims is due to be granted.

## A. Discrimination in Hiring

Under Title VII, a plaintiff claiming disparate treatment bears the ultimate burden of proving that race was a determinative factor in the employer's adverse actions against her. *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989).  A prima facie case of race discrimination may be established with direct evidence of discriminatory intent, statistical proof of a pattern of discrimination, or by circumstantial evidence. *Holifield v. Reno,* 115 F.3d 1555, 1561-62 (11th Cir. 1997)(citations omitted).  A prima facie case of race discrimination is established with circumstantial evidence when a plaintiff:  (1) belongs to a racial minority; (2) was qualified for a position for which the employer was seeking applicants; (3) was rejected; and (4) shows that the position was filled by someone outside the protected group. *See id.* (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).

With regard to her initial appointment as a SSWI, plaintiff has failed to establish a prima facie case of race discrimination.  In her affidavit, Ms. Mahlke, Assistant Director of DHR, states that "During the first six months of 1994 . . . Jefferson County DHR could not hire anyone as a SSWI or SrSSW unless their names were first certified by SPD as being eligible for that position." (Defs.' Ex. 3 at 153.)  The undisputed evidence shows that plaintiff did not meet the qualifications for SSSW: her name was not on a Certificate of Eligibles.

(Defs.' Ex. 3 at 158-59.)  Because she was not "qualified," she does not establish a prima facie case.[5]

Neither party has presented evidence as to whether plaintiff's name was placed on the eligible registers[6] for SSWI and SSSW at the time she filled out her initial application. However, assuming the SPD failed to place plaintiff's name on both eligible registers, there is no evidence on which a reasonable jury could find that SPD discriminated against the plaintiff on the basis of her race in failing to place her name on both registers.

The instructions for the application completed by plaintiff are printed in the top right corner of the first page and read as follows:

GENERAL INSTRUCTIONS:

**A separate application is required for each job**.  Do not write in shaded areas.  Type or print clearly in dark ink and sign.  Complete all parts of the application form.  Applications not properly completed will be returned.

(Defs.' Ex. 1 at 112)(emphasis added).

Plaintiff argues that "Ms. Mahlke . . . could have placed plaintiff on said register and hired her from it immediately without requiring plaintiff to complete an additional application."  (Pl.'s Br. in Opp'n at 5.)  This argument has no support in the evidence submitted to the court.  The evidence reflects that during the first six months of 1994,

---

[5] The evidence is undisputed that plaintiff was qualified by her education and work experience for the position of SSSW.  When the court uses the word "qualified" in this instance, it refers to plaintiff having initially been certified to DHR on the register for the SSWI position, not a SSSW position.

[6] For a discussion of the difference between the SPD's eligible register and Certification of Eligibles, *see infra* note 3.

Jefferson County DHR could not hire **anyone** as a SSWI or SSSW unless their names were first certified by SPD as being eligible for these positions. (Defs.' Ex.3 at 153, ¶ 3.) Plaintiff has failed to show that she was certified for the SSSW position at the time she was initially hired. Even assuming plaintiff had established a prima facie case, she has not put forth sufficient evidence of pretext as to the reason set forth by the defendant DHR for its decision, that is, that plaintiff was not initially hired as a SSSW because her name was on the Certification of Eligibles for SSWI. Defendant is entitled to judgment on plaintiff's claim of discrimination in hiring.

### B. Discrimination in Subjecting Plaintiff to a Second Probationary Period

Plaintiff claims that defendant DHR discriminated against her by requiring her to serve a second probationary period upon being appointed to the position of SSSW. The *McDonnell Douglas* prima facie elements may be adapted to fit this claim by requiring plaintiff to show: (1) that she belongs to a racial minority, (2) that she was qualified to serve only one extended probationary period at DHR for both of the positions to which she was appointed, (3) that plaintiff was denied the chance to serve only one probationary period, and (4) that someone outside the protected group was allowed to serve only one extended probationary period after being appointed to a new position. *See generally Carter v. City of Miami*, 870 F.2d 578, 582-583, n.12 (11th Cir. 1989)(adapting the *McDonnell Douglas* prima facie elements to a claim of age discrimination under the ADEA and stressing that the *McDonnell Douglas* test was not intended to be a rigid or ritualistic test of disparate treatment). The court finds that plaintiff cannot establish the second and fourth elements of her prima facie case, and fails to state a claim of racial discrimination in determining her probationary status.

13

The SPD rules dictate that appointees such as plaintiff are required to start a new probationary period upon being reclassified. Plaintiff cannot show that this rule was enforced against her in a discriminatory manner. The SPD's Rule 670-x-10-.01 states in relevant part that, "[e]very person appointed to a position in the classified service after certification of his name from a promotion list or an employment list shall be tested by a probationary period while occupying such position." (Defs.' Ex. 4 at 175.) As Doris Howard, Assistant to the Personnel Director of DHR, states in her affidavit, the only exceptions to this rule are "employees who are re-appointed from a re-employment register to a position that they previously held and employees who transfer without changing job classifications." (Defs.' Ex. 4 at 164.) Because plaintiff does not fall under either of these exceptions, she is subject to the SPD's Rule 670-x-10-.01 and was required to serve a probationary period upon being appointed to the SSSW position. Plaintiff has not shown that others outside her protected class were not required to serve a probationary period upon appointment to a new position. Because plaintiff has not established a prima facie case of race discrimination with respect to her second probationary period, DHR's motion for summary judgment as to this claim is due to be granted.

## C. Termination on the Basis of Race

Plaintiff claims that DHR terminated her on the basis of her race, however, plaintiff has failed to establish a prima facie case of discriminatory termination under Title VII. Plaintiff has produced no direct or statistical evidence tending to show that her termination from DHR was motivated by race. To establish a prima facie case of discriminatory termination by circumstantial evidence, plaintiff must show: (1) that she is a member of a

14

protected minority, (2) that she was qualified for the job from which she was discharged, (3) that she was discharged, and (4) that her former position was filled by a non-minority. *Weaver v. Casa Gallardo, Inc.* 922 F.2d 1515, 1525 (11th Cir. 1991)(citations omitted). Because plaintiff has failed to allege facts sufficient to establish a prima facie case of termination on the basis of race, DHR's motion for summary judgment as to this claim is due to be granted.

Plaintiff has not produced any evidence that her former position was filled by a non-minority. However, the prima facie case method was "never intended to be rigid, mechanistic, or ritualistic." *Whiting v. Jackson State Univ.*, 616 F.2d 116, 121 (5th Cir. 1980). Plaintiff could also establish the fourth element of her prima facie case by showing that she was terminated while others not in plaintiff's class having comparable or lesser qualifications were retained, or that plaintiff suffered from differential application of work or disciplinary rules. *Weaver*, 922 F.2d at 1525 (citations omitted). Plaintiff has presented no evidence that any of these scenarios occurred. Rather, plaintiff alleges many "inconsistencies and implausibilities" in DHR's articulated reasons for firing her. (*See* Pl.'s Br. in Opp'n at 16-18.) However, none of these inconsistencies listed by plaintiff speaks to the issue of whether Ms. George's termination was racially motivated. Without some evidence that plaintiff's termination was racially motivated, plaintiff cannot prove a prima facie case of discriminatory termination.

Even in the event that plaintiff *were* able to bring forth evidence sufficient to establish a prima facie case of discriminatory termination, DHR has put forth evidence of a legitimate, non-discriminatory reason for terminating the plaintiff. DHR contends that Ms. Kevorkian relied on the recommendations of plaintiff's supervisors that plaintiff be terminated. During

15

plaintiff's termination conference, plaintiff's supervisors, all of whom are African-Americans, articulated a number of legitimate, non-discriminatory reasons for terminating plaintiff, including: several Court Incident Reports submitted to DHR regarding plaintiff's work, acts of insubordination by plaintiff, failure to attend conferences, failure to communicate with supervisors, and plaintiff's bad attitude, poor judgment, and inability to cope with crisis situations. (*See* Defs.' Ex. 1 at 4-23.) These are legitimate reasons for terminating a probationary employee. There is simply no evidence that these complaints from plaintiff's African-American supervisors were a response to plaintiff's race, or that the complaints were a pretext for racial discrimination. Therefore, DHR is entitled to judgment as a matter of law as to this claim.

### D. Retaliation [7]

Title VII prohibits an employer from taking adverse employment action against an employee in retaliation for her opposition to discriminatory practices. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of unlawful retaliation in violation of Title VII, a plaintiff must show that: (1) the plaintiff engaged in statutorily protected activity; (2) the employer was aware of that activity; (3) the plaintiff suffered adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Reynolds v. CSX Transp., Inc.,* 115 F.3d 860, 868 (11th Cir. 1997). Because plaintiff

---

[7] Despite plaintiff's contentions to the contrary, the court does not find that *U.S. v. Frazer*, 317 F. Supp. 1079 (M.D. Ala. 1970) establishes a pattern and practice of discrimination by DHR sufficient to warrant application of a heightened standard requiring DHR to produce "clear and convincing evidence" that job decisions were not made in pursuit of a discriminatory policy. *See* Pl.'s Br. in Opp'n at 13-14. There is no evidence of any racially discriminatory policy currently in effect at DHR, and the traditional *McDonnell Douglas* framework applies.

has not produced evidence sufficient to establish the second or fourth elements of her prima facie case, DHR is entitled to judgment as a matter of law on plaintiff's claim of retaliation.

As to the first element of her prima facie case, plaintiff alleges that she complained to Harriet Mahlke when she learned that Sue Davis, a white female, had been hired as a SSSW.[8] For purposes of the motion for summary judgment, defendant does not dispute that plaintiff engaged in protected expression. Thus, plaintiff has established the first element of her claim.

Plaintiff has not established the second element of her prima facie case of retaliation because she has not produced sufficient evidence to establish that any of the persons she contends took adverse action against her were actually aware of the protected expression at the time they took the adverse action. Plaintiff engages in speculation and asserts that either Ms. Kevorkian or plaintiff's supervisors were aware of plaintiff's alleged conversation with Ms. Mahlke. (*See* Pl.'s Br. in Opp'n at 20-21.) However, there is no evidence to support this contention.

Moving to the third element of her prima facie case, plaintiff has suffered an adverse employment action in that she was terminated. Plaintiff alleges further instances of adverse action by her employer, including assignment of an unduly burdensome caseload, poor evaluations, transfer to an unqualified supervisor, and unwarranted job performance warnings. In attempting to show that there was a causal connection between plaintiff's protected activity

---

[8] Whether or not plaintiff ever made allegations of racial discrimination to Ms. Mahlke is disputed by the parties. Ms. Mahlke does not recall any conversation with the plaintiff on this matter. However, for purposes of summary judgment, the evidence is viewed in a light most favorable to the non-moving party. Therefore, for purposes of this motion, an April 1994 meeting between plaintiff and Ms. Mahlke in which plaintiff complained of racial discrimination is assumed to have taken place.

17

and these adverse employment actions, plaintiff argues that, because these adverse actions followed closely upon the protected activity, a causal connection exists. (*See* Pl.'s Br. in Opp'n at 21.) In support of this argument, plaintiff contends that she was assigned an inordinately heavy caseload "almost immediately" after complaining to Ms. Mahlke.[9] However, timing, i.e., the fact that the adverse employment action was taken after the protected activity, is generally insufficient by itself to prove a causal connection to satisfy a prima facie case. *See Hamm v. Members of Bd. of Regents of State of Fla.*, 708 F.2d 647, 652 & 654 (11th Cir. 1983)(holding that plaintiff failed to establish a causal link between her transfer and her activity even though she was transferred shortly after filing a written complaint with the EEOC). Thus, plaintiff's reliance on a close time-link to establish a causal connection between plaintiff's protected activity and an adverse employment action is misplaced, because a close time-link by itself is insufficient.

The remaining instances of adverse activity, including transfer to a new supervisor, poor performance evaluations, job performance warnings, and termination, all occurred six to eight months after plaintiff engaged in protected activity.[10] Adverse action which occurs six to eight months after protected activity, without more, is not sufficiently close in time to establish

---

[9] For purposes of this motion, the court accepts plaintiff's allegation regarding her case load. The court notes however, that plaintiff's DHR worker caseload information sheets contradict plaintiff's personal recollection of her caseload.

[10] Plaintiff contends that she complained to Ms. Mahlke in April of 1994. (Pl.'s Ex.1 at 3, ¶ 21.) Plaintiff was transferred to Ms. Summerlin's unit in September of 1994. (*Id.* at 4, ¶ 29.) Plaintiff received an unfavorable performance evaluation from Ms. Summerlin in December of 1994. (Defs. Ex. 1 at 80-82.) Plaintiff received a job performance warning in October of 1994. (*Id.* at 94-95.) Plaintiff was terminated in December of 1994. (*Id.* at 1.)

a causal connection.  Even assuming plaintiff could show adverse action followed closely upon the protected activity, such a showing would not cure plaintiff's failure to produce evidence that *any* DHR employee besides Ms. Mahlke was ever made aware of plaintiff's protected activity.  Therefore, plaintiff has not established a prima facie case of retaliation, and defendant is entitled to judgment as a matter of law on this claim.

## II.  Plaintiff's § 1981 Claims

Section 1981 prohibits race discrimination in the making and enforcement of contracts. 42 U.S.C.A. § 1981(a).  A plaintiff must prove intentional discrimination to prevail under § 1981.  *General Building Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982); *Patterson v. McClean Credit Union*, 491 U.S. 164, 186 (1989).  The Supreme Court has held that the standards for testing disparate treatment under Title VII fully apply to § 1981 claims. *Patterson*, 491 U.S. at 186-188 (approving application of the *McDonnell-Douglas/Burdine* approach to §1981 cases); *accord Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991).  *See also Reynolds v. CSX Transp., Inc.*, 115 F.3d 860, 866 (11th Cir. 1997) (equating §1981 hostile environment standards with Title VII hostile environment standards).  The court's previous analysis of plaintiff's Title VII claims are therefore dispositive of plaintiff's § 1981 claims of discriminatory hiring, discrimination in subjecting plaintiff to a probationary period, discriminatory termination, and retaliation.  Accordingly, DHR's motion for summary judgment with respect to plaintiff's § 1981 claims of racial discrimination is due to be granted.

19

### III. Plaintiff's Fourteenth Amendment Claims

In addition to her Title VII and § 1981 claims, plaintiff asserts a claim pursuant to 42 U.S.C. § 1983, and alleges that defendants' conduct violated her Equal Protection rights under the Fourteenth Amendment to the United States Constitution. In *Lee v. Conecuh County Bd. of Educ.*, 634 F.2d 959 (5th Cir. Jan. 1981), the Fifth Circuit held that the same factors used in Title VII cases to establish a prima facie case of racially motivated employment discrimination may be used to establish a claim of race discrimination under 42 U.S.C. § 1983. *Id.* at 962.[11] Therefore, the discussion of plaintiff's Title VII claims is dispositive of what appears to be plaintiff's § 1983 claim against DHR and Mary Lou Kevorkian in her official capacity, alleging racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. (*See* Am. Compl. at ¶¶ 4,16.)

Plaintiff also claims that she was denied an adequate and fair hearing in violation of the Due Process Clause of the Fourteenth Amendment. Although the amended complaint is unclear, the court assumes that plaintiff brings this claim under 42 U.S.C. § 1983, against DHR and Mary Lou Kevorkian in her official capacity.[12] In order to state a claim for a

---

[11] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. Nov. 1981), the Eleventh Circuit held that all decisions of the United States Court of Appeals for the Fifth Circuit handed down by that court on or before September 30, 1981 shall be binding as precedent in the Eleventh Circuit.

[12] In order to state a claim under § 1983, a claimant must allege that the defendant acted "under color of state law." 42 U.S.C. § 1983. In this case it is not clear that defendants constitute state actors for the purposes of a § 1983 claim. However, because plaintiff has failed to allege facts sufficient to find a violation of due process, summary judgment is due to be granted, and it is not necessary to decide whether any of the defendants acted under color of state law in this case.

violation of procedural due process, a claimant must first allege the deprivation of a property or liberty interest protected by the Due Process Clause. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). Plaintiff was properly classified as a probationary employee under Alabama's state merit system, in accordance with the SPD's Rule 670-x-10-.01, at the time she was terminated. The Eleventh Circuit has held that a probationary employee under Alabama's merit system does not have a sufficient property interest in continued employment to support an action for deprivation of Fourteenth Amendment rights. *Blanton v. Griel Memorial Psychiatric Hospital*, 758 F.2d 1540, 1544 (11th Cir. 1985). Plaintiff has not established the deprivation of a property or liberty interest, and therefore fails to state a proper Due Process claim. The court is of the opinion that defendants' motion for summary judgment as to plaintiff's Fourteenth Amendment and § 1983 claims is due to be granted.

## CONCLUSION

Plaintiff's evidence raises no genuine issue of material fact regarding her claims of racial discrimination and deprivation of Due Process. Accordingly, defendants' motion for summary judgment with respect to all of plaintiff's claims is due to be granted. An order granting defendants' motion for summary judgment will be entered contemporaneously herewith.

**DONE** this 27th day of March, 1998.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

21